UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
21ST CENTURY CENTENNIAL INSURANCE COMPANY, BRISTOL
WEST CASUALTY INSURANCE COMPANY, BRISTOL WEST        Docket No.: 1:26-cv-1361
INSURANCE COMPANY, COAST NATIONAL INSURANCE
COMPANY, FARMERS GROUP PROPERTY AND CASUALTY         **COMPLAINT**
INSURANCE COMPANY, FOREMOST INSURANCE COMPANY
GRAND RAPIDS, MICHIGAN, FOREMOST SIGNATURE
INSURANCE COMPANY, MID-CENTURY INSURANCE COMPANY,
And SECURITY NATIONAL INSURANCE COMPANY,

                              Plaintiffs,

          -against-

PURELY PROFESSIONAL PAIN MANAGEMENT, PC, ROCKWELL
MEDICAL PC, ANNAW MD PC, ANNA WISNIEWSKA, AA
COMPREHENSIVE MEDICAL PC, AIA MEDICAL PC, RIVER
PARK PSYCHOLOGICAL SERVICES PLLC, and
KONSTANTINOS TSOUBRIS PHD,

                             Defendants.
-------------------------------------------------------------------------------X

      Plaintiffs, 21ST CENTURY CENTENNIAL INSURANCE COMPANY, BRISTOL WEST CASUALTY INSURANCE COMPANY, BRISTOL WEST INSURANCE COMPANY, COAST NATIONAL INSURANCE COMPANY, FARMERS GROUP PROPERTY AND CASUALTY INSURANCE COMPANY, FOREMOST INSURANCE COMPANY GRAND RAPIDS, MICHIGAN, FOREMOST SIGNATURE INSURANCE COMPANY, MID-CENTURY INSURANCE COMPANY, and SECURITY NATIONAL INSURANCE COMPANY (hereinafter collectively referred to as "Plaintiffs") hereby allege, on information and belief, as follows:

I.      **INTRODUCTION**

1. This action seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants are not entitled to collect No-Fault Benefits for all claims submitted to the Plaintiffs that have not been paid.

2. As noted below, the Defendants have submitted claims for highly questionable and potentially fraudulent treatment to individuals who were involved in automobile accidents and potentially eligible for coverage under insurance policies issued by the Plaintiffs. As set forth herein, this action seeks a declaration that the Defendants are not entitled to seek, keep or receive No-Fault reimbursements from Plaintiffs and Plaintiffs are not obligated to pay reimbursements for any No-Fault related matters pertaining to the Defendants because (a) the Defendants were billing for services not rendered or, to the extent they were provided at all, pursuant to predetermined protocols without any regard to an individual patients needs and/or actual injury, (b) the corporate Defendants were not properly incorporated and/or formed as professional service companies, in violation of New York Business Corporation Law 1508; and (c) Defendants submitted reimbursement for No-Fault claims on behalf of various Claimants for services which were provided by independent contractors in violation of 11 NYCRR 65-3.11.

II.     **THE PARTIES**

**PLAINTIFFS**

3. Plaintiffs are affiliated insurance companies/associations all owned by Farmers Group, Inc., a California corporation. Plaintiffs all operate pursuant to, and in accordance with, the laws of the State of New York but are foreign companies. 21ST CENTURY CENTENNIAL INSURANCE COMPANY is domiciled in Pennsylvania. BRISTOL WEST CASUALTY

INSURANCE COMPANY and BRISTOL WEST INSURANCE COMPANY are domiciled in Ohio. COAST NATIONAL INSURANCE COMPANY is domiciled in California. FARMERS GROUP PROPERTY AND CASUALTY INSURANCE COMPANY is domiciled in Rhode Island. FOREMOST INSURANCE COMPANY GRAND RAPIDS, MICHIGAN and FOREMOST SIGNATURE INSURANCE COMPANY are domiciled in Michigan. MID-CENTURY INSURANCE COMPANY is domiciled in California. SECURITY NATIONAL INSURANCE COMPANY is domiciled in Florida.

4. As part of their business as insurance companies, Plaintiffs sell automobile insurance policies that provide first-party benefits (also known as "No-Fault Benefits") to their policyholders and other eligible persons when they are involved in covered motor vehicle accidents. As noted above, Plaintiffs are variously organized under the laws of multiple states, and each are duly authorized to engage in and conduct the business of an insurance company in the State of New York.

5. Plaintiffs were and still are foreign corporations organized and existing under the laws of a state (s) other than New York. Plaintiffs are duly authorized to engage in and conduct the business of an insurance company in the state of New York.

6. Plaintiffs conduct business in this jurisdiction.

### DEFENDANTS

7. PURELY PROFESSIONAL PAIN MANAGEMENT, PC is a New York State professional corporation listed as owned by Dr. Richard Apple.

8. ROCKWELL MEDICAL, PC is a New York State professional corporation listed as owned by Dr. Jeremie Rachunow.

9. ANNA WISNIEWSKA MD is a New York State licensed physician who resides in New York State.

10. ANNAW MD, PC is a New York State professional corporation listed as owned by WISNIEWSKA.

11. AA COMPREHENSIVE MEDICAL, PC is a New York State professional corporation listed as owned by Dr. Abdalla Adam.

12. AIA MEDICAL, PC is a New York State professional corporation listed as owned by Adam.

13. KONSTANTINOS TSOUBROS PHD is a New York State licensed psychologist who resides in New York State.

14. RIVER PARK PSYCHOLOGICAL SERVICES PLLC, PC is a New York State professional limited liability company listed as owned by TSOUBROS.

### III. SUBJECT MATTER JURISDICTION AND VENUE

15. This Court has jurisdiction, pursuant to 28 U.S.C. § 1332(a)(1), over these claims in this action because the matter is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16. Pursuant to 28 U.S.C. §1391(b), venue is proper in this district because a substantial part of the events giving rise to the claims occurred in this district and because Defendants are residents of the State in which the district is located.

## IV.     ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### AN OVERVIEW OF THE NO-FAULT LAWS

17.     As previously noted, Plaintiffs underwrite automobile insurance policies in the State of New York.

18.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to policyholders and other eligible persons.

19.     No-Fault Benefits include up to $50,000 per insured for necessary expenses that are incurred for healthcare goods and services.  New York's No-Fault Laws are designed to ensure that individuals who are injured in motor vehicle accidents have an efficient mechanism to receive and pay for necessary health care services.

20.     Under the No-Fault Laws, insureds can assign their right to No-Fault benefits to professional health service providers, as long as the providers meet applicable New York State and local licensing requirements to perform such services in New York. With a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form approved by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). Once the healthcare provider takes an assignment of an insured's rights, the provider cannot seek to recover payment

from the insured. Each Defendant appears to have received assignments for the claims at issue in this action.

21. Pursuant to the No-Fault Laws, healthcare service providers are not eligible to receive No-Fault Benefits if they engage in self-referrals, kickbacks, or other illegal payments in violation of New York's Public Health Law so as to have ceded control of their licensed medical practices to unlicensed laypersons who de facto financial control of the practice. Additionally, health care providers that seek to collect No-Fault benefits from New York automobile insurers must be in compliance with all applicable New York licensing laws. In addition, healthcare providers are not entitled to collect for healthcare services that are not medically necessary and/or are based on illegitimate and/or fraudulent findings and/or the billed amounts are excessive.

## AN OVERVIEW OF NEW YORK'S NO-FAULT REGULATIONS

22. The No-Fault Laws obligate healthcare providers, which seek payment of No-Fault Benefits, to provide insurers with additional verification in order to establish proof of their claims.

23. The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 includes a specific section entitled "Conditions", which states in part, that "upon request by the Company, the eligible injured person or that person's assignee . . . shall (b) as may reasonably be required, submit to an examination under oath by any person named by the Company, and shall subscribe to same . . . , and (d) provide any other pertinent information that may assist the Company in determining the amount that is payable."

24. The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 also states that "[n]o action shall lie against the Company, unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage."

25. The proof of claim requirement in the No-Fault policy endorsement, 11 N.Y.C.R.R. § 65-3.5(b) states in relevant part:

> Subsequent to the receipt of one or more of the completed verification forms, any additional verification required by the insurer to establish proof of claim shall be requested within 15 business days of receipt of the prescribed verification forms. Any requests by an insurer for additional verification need not be made on any prescribed or particular form . . .

26. Additionally, 11 N.Y.C.R.R. § 65-3.5(c) states in relevant part:

> The insurer is entitled to receive all items necessary to verify the claim directly from the parties from whom such verification was requested.

27. Moreover, 11 N.Y.C.R.R. § 65-3.5(o) states in relevant part:

> An applicant from whom verification is requested shall, within 120 calendar days from the date of the initial request for verification, submit all such verification under the applicant's control or possession or written proof providing reasonable justification for the failure to comply. The insurer shall advise the applicant in the verification request that the insurer may deny the claim if the applicant does not provide within 120 calendar days from the date of the initial request either all such verification under the applicant's control or possession or written proof providing reasonable justification for the failure to comply.

28. An insurer is entitled to any information that is necessary for the insurer to determine whether the claim submitted by the healthcare provider is payable. The issues for which additional verification can be properly sought are not limited to, and can include, for example:

 (i) whether the services provided by the healthcare provider were rendered, medically necessary, and/or the billed amounts are excessive;

 (ii) whether the physical examination findings and diagnoses documented in the records are accurate and authentic;

 (ii) whether the services were the product of self-referrals, kickbacks, or other inappropriate financial considerations; and

(iii) whether the services are reimbursable because the services were provided by an independent contractor.

### AN OVERVIEW OF THE APPLICABLE NEW YORK PUBLIC HEALTH LAW, NEW YORK EDUCATION LAW, AND NEW YORK BUSINESS CORPORATION LAW

29. Pursuant to the No-Fault Laws, healthcare service providers are not eligible to receive No-Fault Benefits if they engage in self-referrals, kickbacks, or other illegal payments in violation of New York's Public Health Law.

30. Additionally, health care providers that seek to collect No-Fault benefits from New York automobile insurers must be in compliance with all applicable New York licensing laws. In addition, healthcare providers are not entitled to collect for healthcare services that are not medically necessary and/or are based on illegitimate and/or fraudulent findings and/or the billed amounts are excessive.

31. New York Public Health Law ' 238-d states:

a. With respect to referrals not prohibited pursuant to this title, and except as provided in subdivision three of this section, a practitioner may not make a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner or immediate family member of such practitioner has any of the following financial relationships without disclosing to the patient such financial relationship:

(a) an ownership or investment interest, as defined in subdivision three of section two-hundred thirty-eight-a of this title, with such health care provider.

New York Public Health Law 238-a(3) states:

3. For the purposes of this section, an ownership interest or an investment interest:

(a) may be through equity, debt or other means.

New York Business Corporation Law 1507(a) states:

(a) A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation or a predecessor entity, or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued. No shareholder of a professional service corporation shall enter into a voting trust agreement, proxy, or any other type agreement vesting in another person, other than another shareholder of the same corporation or a person who would be eligible to become a shareholder if employed by the corporation, the authority to exercise voting power of any or all of his shares. All shares issued, agreements made, or proxies granted in violation of this section shall be void.

New York Business Corporation Law 1508(a) states:

(a) No individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession which such corporation is authorized to practice and is either a shareholder of such corporation or engaged in the practice of his profession in such corporation.

11 N.Y.C.R.R. 65-3.16(a)(12) states:

A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

11 N.Y.C.R.R. 65-3.11(a) states:

An insurer shall pay benefits for any element of loss other than death benefits, directly to the applicant or, when appropriate, to the applicant's parent or legal guardian or to any person legally responsible for necessities, or, upon assignment by the applicant or any of the aforementioned persons, shall pay benefits directly to providers of health care services as covered under section 5102(a)(1) of the Insurance Law, or to the applicant's employer for loss of earnings from work as authorized under section 5102(a)(2) of the Insurance Law. Death benefits shall be paid to the estate of the eligible injured person.

New York Education Law 6530 states:

> Each of the following is professional misconduct, and any licensee found guilty of such misconduct under the procedures prescribed in section two hundred thirty of the public health law shall be subject to penalties as prescribed in section two hundred thirty a of the public health law except that the charges may be dismissed in the interest of justice:
>
> * * *
>
> Permitting any person to share in the fees for professional services, other than: a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee. This prohibition shall include any arrangement or agreement whereby the amount received in payment for furnishing space, facilities, equipment or personnel services used by a licensee constitutes a percentage of, or is otherwise dependent upon, the income or receipts of the licensee from such practice, except as otherwise provided by law with respect to a facility licensed pursuant to article twenty-eight of the public health law or article thirteen of the mental hygiene law.

32. Pursuant to New York Insurance Law § 403, the NF-3 forms submitted by healthcare providers to Plaintiffs, and to all other automobile insurers, must be verified by a healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act which is a crime.

33. Similarly, all HCFA-1500 (CMS-1500) Forms submitted by a healthcare provider to Plaintiffs, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be

guilty of a criminal act punishable under law and may be subject to civil penalties.

## V.     PLAINTIFFS' INVESTIGATION

34. Defendants are transient providers that operate at several clinics that cater to the treatment of patients involved in motor vehicle accidents. To access these patients, Defendants, including their agents, entered into arrangements at these clinics which permitted the Defendants to submit bills for services allegedly provided to the patients who were treating at these clinics. It should be noted that these "pay for access" arrangements have been an issue of concern throughout the New York Metropolitan area as they can often be disguised kickback arrangements at clinics which are often fraudulently controlled by laypersons rather than licensed healthcare providers.

35. In addition to concerns as to whether Defendants pay for access to these patients, there are concerns regarding whether the services reportedly provided by the Defendants are necessary and accurately billed.

36. In reviewing the records for different patients, many times, Defendants billed using the same biller, and the documentation submitted to support the billing did not describe the procedure but merely gave generic descriptions. In fact, on at least one occasion, Defendant PURELY PROFESSIONAL submitted some bills with Defendant WISNIEWSKA's social security number.

37. Defendants PURELY PROFESSIONAL, ROCKWELL, ANNAW, WISNIEWSKA, and AIA submitted treatment for Shockwave Therapy and Biowave PENS that mirrored each other and used the same manufacturer invoice company and invoice number to substantiate charges for BioWave PENS treatment. In addition, these providers used some of the

same treating professionals on their medical reports. These providers represented that these overlapping professionals were employees of each entity.

38. Defendants ANNAW, WISNIEWSKA, RIVER PARK, and TSOUBRIS submitted bills for psychological testing that were mirrored and often involved over six hours of testing for each patient with similarity scores over 87% per patient. Moreover, the treatment records were substantially the same, with almost all patients receiving the same billing codes of 90791, 90885, 96101, 96116, and 96118. These codes represented that these providers were spending long periods of time treating patients, when the records and patient statements did not reflect that representation.

39. Based on these questionable facts, Plaintiffs undertook additional investigations to assess the legitimacy of any alleged treatment submitted by Defendants, as well as whether the Defendants had ceded control of their practices to the same group of layperson billing and finance groups.

40. Plaintiffs' background investigation found the following facts:

In 2005, Apple was disciplined by the New York Department of Health for failure to maintain accurate records.

In 2019, GEICO filed an action to recover more than $550,000 in claims paid to a pharmacy with allegations of Apple prescribing unnecessary prescriptions for a multitude of pharmaceuticals as part of a predetermined protocol and kickback scheme.

In 2020, GEICO filed an action to recover more than $375,000 in claims paid to a durable equipment company with allegations of Apple prescribing unnecessary prescriptions for medical equipment as part of a predetermined protocol and kickback scheme.

> In 2022, GEICO filed an action to recover more than $320,000 in claims paid with allegations that RIVER PARK's alleged Program Administrator Jessica Paulin participated in a scheme to submit false psychological testing bills.
>
> In 2024, Liberty Mutual filed an action to recover more than $550,000 in claims paid with allegations of Adam did not control his prior corporation and because he was prescribing unnecessary prescriptions for unnecessary treatment, tests, durable medical equipment, prescription drugs, and other services.
>
> In 2025, Liberty Mutual filed an action to recover more than $620,000 in claims paid with allegations of Adam did not control AA COMPREHENSIVE or AIA and because he was prescribing unnecessary prescriptions for a multitude of unnecessary treatment, tests, durable medical equipment, prescription drugs, and other services.
>
> PURELY PROFESSIONAL, ROCKWELL, AIA, and ANNAW have attached manufactured invoices to document costs for Biowave patches using the same invoice number.
>
> Some of the locations where treatment was allegedly submitted are associated with several other medical providers who submitted suspect claims.

41. Based on these facts, Plaintiffs sought examinations under oath ("EUOs") of Defendants to verify whether Defendants were: (a) unlawfully incorporated and owned and/or controlled by unlicensed laypersons, (b) engaged in unlawful fee sharing and/or kickback arrangements with unlicensed individuals who had de facto control of the medical practices, (c) were performing services that were/are not medically necessary and being provided pursuant to predetermined protocol, and (d) were improperly billing for services performed by independent contractors.

## VI.   ATTEMPTS TO EUO DEFENDANTS

42. In 2024, Plaintiffs elected to make formal requests for an EUO of Defendants in connection with the claims listed in **Exhibit "A."**

43. Apple appeared for EUO on behalf of PURELY PROFESSIONAL and testified as follows:

- PURELY PROFESSIONAL treats patients at five locations that were supplied to him by his management company MDX, which also schedules patients, collects and retains the medical reports, and Apple would have to request access to the reports from MDX.

- MDX sets up protocols for PURELY PROFESSIONAL's practice through written guidelines for the services that it performs on the patients and how the services help the patients. MDX creates all letters of medical necessity that are supplied with bills submitted to insurance companies. These letters of medical necessity were created by MDX with the help of the manufacturer.

- Apple has never performed shockwave or BioWave PENS treatments and is not qualified to monitor his alleged treating professionals.

- Apple stated that PURELY PROFESSIONAL pays MDX $20,000 per month for management services. MDX also referred Apple to AVL Capital to advance funds in exchange for a percentage of billing that is collected, though he could not recall the exact terms. AVL Capital and Lamond work together on the billing. Apple does not have direct access to information on the patients and must go to MDX if he needs the information

- Apple's signature is on every claim form as the professional who performed the service, however he could not state if he actually performed all services and it appeared that his signature was pre-printed on all forms. When asked if there was an electronic signature that the billing company had, he stated he could not be sure if it had his electronic signature.

- After the EUO, Plaintiffs requested documents to further verify the testimony. The response only raised more questions. PURELY PROFESSIONAL produced an agreement with MDX showing that it agreed to pay MDX $30,000 per month, 50% more than Apple testified to at the EUO. In addition, it did not produce a finance agreement with AVL Capital but rather with a company called Junior Mint Consulting, Inc., which was never mentioned at EUO. The document production had other questionable aspects. The agreement between PURELY PROFESSIONAL and its collections attorney was signed after Apple's EUO. The lease agreements produced were signed immediately before the EUO, even though Apple testified that he entered into lease agreement much earlier.

44. RIVER PARK appeared for EUO via "Program Administrator" Jessica Paulin who testified as follows:

- She is paid over $7,000 per month to run River Park and a billing and management company whose name she did not know received over 50% of receivables collected.

- TSOUBRIS lived in upstate New York and never came to New York City to meet with patients and all testing was done by part-time social workers, who receive no benefits.

- Paulin located all clinics where RIVER PARK received permission to rent space for access to patients.

- The records and billing documents are all kept by the billing company, which maintains a signature stamp of TSOUBRIS, and she was not sure when and how often the billing was reviewed or generated by TSOUBRIS.

- After the EUO, RIVER PARK produced some requested documents showing that it shared a finance company with the other Defendants and that up to 90% of accounts receivable were pledged to the finance company, which retained control of records and had access to bank accounts. Money was lent to RIVER PARK at rates of 35-45%. RIVER PARK claimed to have no general ledger, even though its agreement with the finance company expressly acknowledged that the finance company had reviewed the general ledger as a condition of lending money to RIVER PARK.

- Plaintiffs requested a second EUO to address the new facts raised in the post-EUO disclosure of documents but RIVER PARK refused to appear or produce the general ledger.

45. Despite due demand, the remaining Defendants failed to appear for EUOs.

46. Each request was timely made and based upon the application of objective standards justifying the information sought by Plaintiffs that would address the concerns summarized above and would allow Plaintiffs to properly evaluate the claims.

47. The failure and/or refusal to appear for EUOs constitutes a material breach of Plaintiffs' insurance policies and the No-Fault Laws under which the claims have been made and, as such, relieves Plaintiffs from any obligation to pay Defendants on any of the claims listed in **Exhibit "A"**.

48. Upon information and belief, Defendants are not actually controlled by licensed professionals, are submitting false claims, and are improperly billing for the services of independent contractors.

## VII. CLAIMS FOR RELIEF

### AS AND FOR A FIRST CAUSE OF ACTION

**(Against all Defendants- Declaratory Judgment: Violation of No-Fault Regulation; Failure to Appear for EUO)**

49. Plaintiffs incorporate each and every allegation contained in Paragraphs 1 through 48 of this Complaint as if fully set forth at length herein.

50. There is an actual case in controversy between Plaintiffs and the Defendants regarding nearly $1,000,000 in billing for healthcare services that has been submitted to Plaintiffs. The claims in dispute are listed on *Exhibit "A"*.

51. Defendants have no right to receive payment for any of the claims listed on *Exhibit "A"* because they failed and/or refused to verify their claims. Specifically, Defendants failed to appear for EUOs breaching a condition precedent to coverage.

52. Accordingly, Plaintiffs request a judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for the claims submitted to FARMERS and listed on *Exhibit "A"*.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Against the Defendants - Declaratory Judgment: Violation of BCL)**

53. Plaintiffs repeat, reiterate, and re-allege the allegations set forth in paragraphs numbered 1 to 52 of this Complaint with the same force and effect as if set forth fully herein.

54. At all relevant times herein, the Defendants were not properly incorporated and/or formed as professional service companies, in violation of New York Business Corporation Law 1508.

55. Accordingly, FARMERS requests a judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any claims submitted to FARMERS.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Against Defendants - Declaratory Judgment: Violation of 11 N.Y.C.R.R. 65-3.11(a)**

56. Plaintiffs repeat, reiterate and re-allege the allegations set forth in paragraphs numbered 1 to 55 of this Complaint with the same force and effect as if set forth fully herein.

57. At all relevant times herein, Defendants submitted reimbursement for No-Fault claims on behalf of various Claimants for services which were provided by independent contractors.

58. Based upon the foregoing, Plaintiffs are entitled to a judgment declaring, pursuant to 28 U.S.C. §§ 2201 and 2202, that Defendants have no right to receive payment for the claims submitted to Plaintiffs because these services were performed by independent contractors with respect to the Defendants and any such claims brought on their behalf are in violation of 11 NYCRR 65-3.11.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Against all Defendants- Declaratory Judgment: Violation of No-Fault Regulation and New York Public Health Law)**

59. Plaintiffs repeat, reiterate, and re-allege the allegations set forth in paragraphs numbered 1 to 58 of this Complaint with the same force and effect as if set forth fully herein.

60. There is an actual case and controversy between Plaintiffs and the Defendants regarding nearly $1,000,000 in fraudulent billing for the fraudulent services that have been submitted to Plaintiffs through the Defendants.

61. The Defendants have no right to receive payment for any pending bills submitted to Plaintiffs because the fraudulent services were not medically necessary and were provided, to the extent that they were provided at all, pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the claimants.

62. Defendants have no right to receive payment for any pending bills submitted to Plaintiffs because the fraudulent services, to the extent that they were provided at all, were illusory and useless and played no genuine role in the treatment or care of the claimants.

63. Accordingly, Plaintiffs request a judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to Plaintiffs.

**WHEREFORE**, Plaintiffs demand that a judgment be entered in their favor:

    i. On the First Cause of Action against Defendants, declaring that Plaintiffs owe no duty to pay No-Fault claims to the defendants for all claims in which Defendants failed to comply with conditions of coverage;

      ii.    On the Second Cause of Action against Defendants, declaring that Plaintiffs owe no duty to pay No-Fault claims to the defendants for any pending bills submitted to FARMERS; and

      iii.   On the Third Cause of Action against Defendants, declaring that Plaintiffs owe no duty to pay No-Fault claims to the Defendants for any pending bills submitted to FARMERS.

      iv.   On the Fourth Cause of Action against Defendants, declaring that Plaintiffs owe no duty to pay No-Fault claims to the Defendants for any pending bills submitted to FARMERS.

Dated: New York, New York
       February 18, 2026

_____
                                  Harlan Schreiber, Esq.